IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAIVONNE FLENORY-DAVIS,<br><br>              Petitioner,<br><br>vs.<br><br>SUZANNE M. PEERY, Warden, California<br>Correctional Center, Susanville,[1]<br><br>              Respondent. | No. 2:15-cv-00425-JKS<br><br>MEMORANDUM DECISION |

Jaivonne Flenory-Davis, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Flenory-Davis is in the custody of

the California Department of Corrections and incarcerated at the California Correctional Center

in Susanville.  Respondent has answered, and Flenory-Davis has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On June 13, 2012, Flenory-Davis was charged with murder (count 1) and attempted

murder (count 2).  The information alleged as to both counts that Flenory-Davis used and

intentionally and personally discharged a firearm causing great bodily injury or death.  The

information also alleged as to both counts that Flenory-Davis committed the offenses for the

benefit of, at the direction of, or in association with a criminal street gang with the specific intent

to promote, further, and assist in criminal conduct by gang members.  It was additionally alleged

as to count 2 that Flenory-Davis personally inflicted great bodily injury and intended to inflict

---

[1]         Suzanne M. Peery is substituted for Mike McDonald as Warden, California
Correctional Center, Susanville.  FED. R. CIV. P. 25(d).

such injury.  The information further alleged that Flenory-Davis had suffered a prior serious

felony conviction for first-degree burglary.  Flenory-Davis pled not guilty to both counts and

denied the allegations.  Flenory-Davis proceeded to a jury trial on July 9, 2012.  On direct appeal

of his conviction, the California Court of Appeal laid out the following facts underlying the

charges against Flenory-Davis and the evidence presented at trial:

> On July 11, 2010, a gang fight broke out at a party for teenagers at a rented venue on Auburn Boulevard, and two wholly innocent bystanders were shot, 14–year–old Lanajah Dupree, who died at the scene, and C.M., an older teenage girl who survived.
>
> The defense theory was to concede the shootings were heinous and unjustified, but contend that [Flenory-Davis] was innocent, and Nikko Alexander, the alleged accomplice, blamed [Flenory-Davis] to avoid Alexander's own liability for shooting the girls.
>
> A number of teenagers went to a club party advertised online.  There were security guards present.  At some point, people started running and yelling "fight" and "gun" and then pepper-spray was deployed; when everyone rushed outside, gunshots were fired.  A friend saw Dupree die on the ground near the doorway.
>
> Alexander testified his girlfriend told him she was at the party, and he called [Flenory-Davis] ("Jay") and they went together to the party, with Alexander driving.  Alexander's car was white with a black fender and gray bumper.  Alexander did not have a gun in the car and did not know [Flenory-Davis] had one.  He parked at the far end of the nearby Tradewinds Motel, and they walked to the club.  [Flenory-Davis] was wearing a long black T-shirt, extending below his pants pockets.  After paying a fee, Alexander was "patted down" by security before he could enter.  At some point, Alexander saw some men from Gunz–Up, a rival gang, in the club.  Alexander was affiliated with the Guttah Boyz gang in Sacramento.  He disclaimed knowledge of any "beef" with the Gunz–Up gang.  The Gunz–Up members asked [Flenory-Davis] where he was from, to which he responded "G–Mobb."  This led to a fight, in which Alexander and [Flenory-Davis] were overmatched by 10 to 15 Gunz–Up members, and there were no "south area" affiliates (from Guttah–Boyz, Stick–Up Starz, or G–Mobb gangs) to assist the duo.  Eventually they were pepper-sprayed, Alexander's girlfriend pushed him through and out of the club, and as he ran up the driveway of the hotel toward his car, he saw [Flenory-Davis] coming back from the same direction.  Alexander followed [Flenory-Davis] toward the club, thinking they were going to fight, and then [Flenory-Davis] started shooting.  [Flenory-Davis] fired about six times, but Alexander did not see where he was shooting.  Alexander ran to the car and drove off with [Flenory-Davis].  He testified that he asked [Flenory-Davis] no questions, was afraid, and just wanted to get away.  When Alexander learned two girls had been shot—one fatally—he felt responsible, though he had been "surprised and shocked" [Flenory-Davis] had a gun and could not have stopped him.

The jury was shown a video recording from the motel and Alexander testified the car seen therein was his car. He identified himself and [Flenory-Davis] as the two people seen leaving the car and walking toward the club; he was wearing a white shirt and [Flenory-Davis] had on a black shirt. The recording later shows Alexander returning to the car; he testified that he returned to leave his jacket in the car.

The video, which we have reviewed, is not of good quality. It shows a white car with a dark fender and bumper park (backing in) on the side of the motel farthest from the club. Two men, in white (Alexander) and black ([Flenory-Davis]) T-shirts, respectively, walk toward the club. Alexander returns to the car and runs back to the club, again returns to the car, then again runs back toward the club. Several minutes after that, [Flenory-Davis] runs to the car, followed by Alexander, but before Alexander even reaches the car, [Flenory-Davis] runs back past him towards the club and Alexander turns and follows. Soon after, both run back to the car and quickly leave the parking lot.

Alexander admitted that when he first spoke to the police, he lied and said he left the party before the shooting began, and he may have said he was by himself. The second time he spoke to the police, with the assistance of counsel, he told the truth, because he did not want to "do life" for something [Flenory-Davis] did, and his parents had urged him to be honest. He testified that the third time he spoke with the police, an investigator, the prosecutor, and his father were present, and he told the truth that time, too. He agreed to testify truthfully in exchange for an eight-year prison sentence, based on his plea to being an accessory to murder, with a gang enhancement.

The jury watched a DVD recording of the third interview between Alexander and the police. In it, Alexander said [Flenory-Davis] shot toward the club, where the people from the club were standing, shooting into the crowd, but Alexander could not see any of the people they had fought with. He heard "probably" eight shots. After the shooting made the news, [Flenory-Davis] told Alexander not to say anything.

Bianca B. testified she heard Alexander being confronted by another person at the party, which made Alexander look scared. After the shooting, she saw Alexander running and jumping over a gate between the motel and a car dealership. M.M. testified she felt tension when some men in the club pointed to another man and used profanity, so she and her friends went to tell a guard, but then people started to run out of the club. Later, while outside the club, she heard seven or eight gunshots, and one of her friends yelled "gun." A Black man wearing a black shirt, bandana, and "dreads" ran past her. She told the police the man had a black semi-automatic, but explained that is what she learned from her friend Skye.

Skye B. saw several males confront Alexander in the club, and they "swarmed" him, so she and her friends got scared and went to tell a guard. They ran out towards a car dealership and saw two "boys" running toward the motel. Then one ran back, carrying a gun, then Skye B. heard multiple gunshots fired soon after. The man with the gun was wearing a dark shirt, a bandana, and had short dreadlocks, and she described him to an officer as Black, with a "big black shirt" and "blonde tips" on his dreadlocks. The gun was a black handgun. She was not "a hundred percent sure," but [Flenory-Davis] had a "familiar face" to that of the man with the gun. She had picked him out as the shooter in a live line-up before trial, but she had not been positive then, either, writing

that "I'm not sure but I think No. 2 [Flenory-Davis] was the person" with the gun. A detective testified that [Flenory-Davis] had the same general appearance as the description of the shooter that emerged from Skye B. and the other witnesses—a Black male, about 5'10" and 150 pounds, with dreadlocks that had colored tips.

J.G. was Alexander's girlfriend. She was at the club that night and saw him "in the middle of a lot of boys," grabbed him, and then the guards "pepper sprayed." She saw [Flenory-Davis] but could not remember whether he, too, was fighting in the club. Alexander did not discuss the shooting with her.

One of the guards testified that about eight to 10 guards were working that night. He and another guard broke up the indoor fight, and after the other guard used pepper spray, "everybody began to run outside." While he was standing behind his patrol car, he heard gunshots coming from the front of the car, and when he lay on the ground, he could see the shooter's legs, and then saw the shooter—a Black man with braided hair—run towards an alleyway, with another Black male. Another guard testified he saw "about five young men beating and kicking two other men"—all Black—and tried to stop the fight, and eventually used his pepper spray. Outside, he saw muzzle flashes, about two or three into the air, and four of five directed lower, where the bullets ricocheted off the ground toward the building. He saw three to four Black males running from where he had seen the flashes. The one he thought was the shooter had a black T-shirt and "dreadlocks about shoulder length."

Dupree was shot through her heart. A criminalist examined six cartridge casings and a bullet. The casings were all fired from the same gun, a nine-millimeter gun, consistent with the bullet. That bullet was found just inside the front door of the building, and the six casings had been grouped together on the ground, showing the shooter was stationary.

Detectives were told by several witnesses that they had heard the name "Nikko Alexander" spoken at the party, and they learned of a white car with black front fender involved with the shooting. Alexander's photograph was used to confirm his presence at the club. They interviewed him and seized his car. During the first interview, Alexander identified "Jay" as the shooter, and the description the detectives developed was that of a Black male, about 5'10", with dreadlocked hair, wearing a black T-shirt. Alexander's relatives identified a photograph of [Flenory-Davis] as Alexander's friend "Jay." The detectives arranged a live line-up which they showed to nine witnesses, but only one, Skye B., picked [Flenory-Davis] as the shooter. Alexander's and [Flenory-Davis'] fingerprints were found in Alexander's car.

A gang expert testified [Flenory-Davis] was a member of the G–Mobb street gang, which is affiliated with the Starz or Stick–Up Starz and Guttah or Guttah Boys subsets. In 2007 to 2008, some members of the Guttah Boys broke away and called themselves Gunz or Gunz–Up and allied with the local Bloods, who dominate Sacramento gangs, and are G–Mobb enemies. [Flenory-Davis] was a member of the Starz–Up subset of G–Mobb, but lived in Blood territory, his house was shot up once, and he also had been shot in the leg while in his neighborhood. Alexander is also a member of Starz–Up. The shooting at the club was gang-related. The failure to respond

to a challenge or disrespect by a rival gang member would cause a loss of face, hence, a challenged gang member "must retaliate" to maintain his status.

*People v. Flenory-Davis*, No. C072000, 2014 WL 4088105, at *1-3 (Cal. Ct. App. Aug. 20, 2014).

At the conclusion of trial, the jury found Flenory-Davis guilty of both counts and found true all of the corresponding allegations.  The trial court sentenced Flenory-Davis on count 1 to an indeterminate term of 25 year to life imprisonment plus 25 years to life on the corresponding firearm enhancement plus a determinate term of 10 years on the corresponding gang enhancement.  Flenory-Davis was also sentenced to an indeterminate term of 7 years to life imprisonment on count 2 plus 25 years to life on the corresponding firearm enhancement plus 10 years on the corresponding gang enhancement.  He was also sentenced concurrently on a pending burglary case.

Through counsel, Flenory-Davis appealed his conviction, arguing that: 1) no substantial evidence corroborated the testimony of an accomplice; 2) the trial court misinstructed on the "kill zone theory"; 3) the prosecutor committed misconduct in argument; 4) the trial court made two sentencing errors; and 5) the trial court erred in not awarding actual custody credits.  The People conceded the sentencing claims but otherwise opposed the appeal.  The Court of Appeal modified the judgment to correct the sentencing errors and remanded for resentencing on count 1, but affirmed the judgment against Flenory-Davis in all other respects in a reasoned, unpublished opinion issued on August 20, 2014.  *Flenory-Davis*, 2014 WL 4088105, at *8. Flenory-Davis petitioned for review in the California Supreme Court, which was denied without comment on October 29, 2014.

Flenory-Davis timely filed a *pro se* petition to this Court on February 17, 2015.  *See* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Flenory-Davis argues that: 1) the accomplice testimony was not sufficiently corroborated; 2) the trial court erred by using an inflammatory "kill zone" instruction that it failed to define; and 3) the prosecutor committed misconduct in a number of ways.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

V. DISCUSSION

Ground 1.      Uncorroborated Accomplice Testimony

Flenory-Davis first claims that the evidence was insufficient to support his convictions because the primary evidence against him came from an accomplice whose testimony was not sufficiently corroborated.  Under California law, uncorroborated accomplice testimony cannot support a criminal conviction.  CAL. PENAL CODE § 1111.  As the Court of Appeal explained when rejecting Flenory-Davis' claim on direct appeal:

> The testimony of an accomplice must be corroborated "by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."  ([Cal. Penal Code] § 1111.)  Testimony of an accomplice adverse to the defendant must be viewed with caution.  (*People v. Guiuan* (1998) 18 Cal. 4th 558, 569.)  The jury was instructed to apply these rules to Alexander's testimony.
> "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone.  [Citations.]  It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified.  [Citations.]  It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' " (*People v. Valdez* (2012) 55 Cal. 4th 82, 147–148; *see* CALCRIM No. 335.)

*Flenory-Davis*, 2014 WL 4088105, at *4.

However, the United States Supreme Court has held that "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them."  *Caminetti v. United States*, 242 U.S. 470, 495 (1917); *see United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its face.").  "When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions."  *United States v. Augenblick*, 393 U.S. 348, 352 (1969).  Therefore, the requirement of California Penal Code § 1111 that "'a conviction cannot be had upon the

-8-

testimony of an accomplice unless it be corroborated' is a matter of state law, which does not

implicate a federal constitutional right" and cannot be the basis of federal habeas relief. *Barco v.*

*Tilton*, 694 F. Supp. 2d 1122, 1136 (C.D. Cal. 2010).

As the Ninth Circuit has explained, California's statutory law prohibiting convictions

based solely on uncorroborated accomplice testimony is only a state law rule: it is not required

by Constitution or federal law. *See Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000).

Thus, because Flenory-Davis' claim is grounded in the state law requirement that accomplice

testimony be corroborated, he can show no constitutional violation based on the alleged

inadequate corroboration. *Takacs v. Engle*, 768 F.2d 122, 127 (6th Cir. 1985) ("If

uncorroborated accomplice testimony is sufficient to support a conviction under the Constitution,

there can be no constitutional right to instruct the jury that it must find corroboration for an

accomplice's testimony."); *see also United States v. Fritts*, 505 F.2d 168, 169 (9th Cir. 1974)

(holding on direct review that trial court's failure *sua sponte* give cautionary instruction on

accomplice testimony did not warrant reversal).

In any event, the Court of Appeal reasonably concluded that there was sufficient

evidence to corroborate Alexander's testimony:

> The gist of [Flenory-Davis'] contention is that Alexander was the only witness
> who identified [Flenory-Davis] as the shooter.  This is not fully accurate.
> Although Alexander may have been the only witness who testified directly and
> positively that [Flenory-Davis] was the shooter, other evidence corroborated that
> testimony.  Skye B. saw [Flenory-Davis] with a gun before the shooting, and she thought
> he was the shooter.  An identification need not be certain to be of probative value.  (*See
> People v. Gonzales* (1968) 68 Cal. 2d 467, 472 ["Lack of positiveness as to the man's
> identity went to the weight and not to the competency of the evidence"]; *People v. Young*
> (1894) 102 Cal. 411, 413.)  The motel video recording shows a Black man running in a
> black T-shirt after the shooting, and one guard testified the shooter was Black, wearing a
> black T-shirt and had dreadlocks, which matches [Flenory-Davis'] description, and that
> the shooter ran off with another Black man, presumably Alexander.  Another guard also

testified he thought the shooter was a Black man wearing a black T-shirt and long dreadlocks. [Flenory-Davis'] fingerprints were found in Alexander's car, corroborating Alexander's testimony that [Flenory-Davis] went to the club with Alexander. Several witnesses testified about the gang challenge and fight that provided [Flenory-Davis] a motive, in that both he and Alexander are in the same gang, and had been attacked by rival gang members, calling for retaliation, in the culture of criminal street gangs as described by the gang expert.

In short, there is sufficient evidence in the record to corroborate Alexander's testimony identifying [Flenory-Davis] as the shooter.[FN2]

> FN2. To the extent [Flenory-Davis] recasts his claim as a denial of federal due process, "the corroboration requirement itself is a matter of state law, not due process." (*People v. Felton* (2004) 122 Cal. App. 4th 260, 273.) In any event, we find adequate corroborating evidence, described above. Therefore we reject [Flenory-Davis'] alternative federal claim.

*Flenory-Davis*, 2014 WL 4088105, at *4.

This Court is bound by the state appellate court's determination that Alexander's testimony was sufficiently corroborated under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). Accordingly, Flenory-Davis is not entitled to relief on this claim.

Ground 2.      <u>Instructional Error</u>

Flenory-Davis next contends that the trial court made two errors with respect to the "kill-zone" instruction offered to the jury. The modified pattern instruction as given in this case was as follows:

> A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of [C.M.], the People must prove that the defendant not only intended to kill a specific victim or victims, but also either intended to kill [C.M.], or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill [C.M.] or intended to kill [C.M.] by killing

everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [C.M.].

Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted or was not improper under state law. *See Bradshaw*, 546 U.S. at 76; *see also Williams*, 52 F.3d at 1480-81. An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental

-11-

fairness" is very narrowly drawn.  *Id.* at 72-73.  "Beyond the specific guarantees enumerated in

the Bill of Rights, the Due Process clause has limited operation."  *Id.*  Where the defect is the

failure to give an instruction, the burden is even heavier because an omitted or incomplete

instruction is less likely to be prejudicial than an instruction that misstates the law.  *See*

*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

  A. *Inflammatory instruction*

  Flenory-Davis first argues that the term "kill zone" is so inflammatory that its use was

unduly prejudicial.  The Court of Appeal noted that the argument had been rejected by the Third

District Court of Appeal in *People v. Campos*, 67 Cal. Rptr. 3d. 904, 917 (Cal. Ct. App. 2007),

which held that the term "does not invite inferences favorable to either party and does not

integrate facts . . . as an argument to the jury."  The *Flenory-Davis* Court agreed, concluding,

"The pattern instruction would not tend to inflame the jury, invite it to draw inferences favorable

to either party, characterize the evidence adversely to [the] defendant, or tell the jury that a kill

zone had been created."  *Flenory-Davis*, 2014 WL 4088105, at *5.

  This Court concurs with those state courts that the instruction contained no constitutional

infirmity.  Indeed, similar constitutional challenges to the "kill zone" instruction have been

uniformly rejected.  *See, e.g.*, *Aleman v. CDCR*, No. 14-cv-00728, 2015 WL 3254029, at *16

(E.D. Cal. Jun. 13, 2016); *Chaidez v. McDonald*, No. 11-cv-10335, 2015 WL 575849, at *28

(C.D. Cal. Feb. 11, 2015); *Perez v. Cate*, No. 12-cv-6500, 2014 WL 3845093, at *6-7 (C.D. Cal.

May 27, 2014), *adopted by* 2014 WL 3845097 (C.D. Cal. Aug. 5, 2014).  When considered in

the context of the overall jury instructions and the trial record, it is not reasonably likely that the

jury applied the instruction in a way that violated the Constitution.  *See Estelle*, 502 U.S. at 72.

Case 2:15-cv-00425-JKS   Document 14   Filed 07/08/16   Page 13 of 19


The state court's rejection of this claim therefore did not contravene or unreasonably apply federal law, and Flenory-Davis is not entitled to relief on this ground.

        B.     *Failure to define*

Flenory-Davis also argues that the term "kill zone" was not adequately defined by the jury instructions.  In rejecting this claim, the Court of Appeal pointed out that the California Supreme Court had previously rejected such an argument in *People v. Stone*, 205 P.3d 272, 276 (Cal. 2009).  *Flenory-Davis*, 2014 WL 4088105, at *5.  In *Stone*, the California Supreme Court held that the "kill zone" theory was "not a legal doctrine requiring special jury instructions," but was simply a reasonable inference that the jury may draw in a given case.  *Stone*, 205 P.3d at 276; *see also People v. Perez*, 234 P.3d 557, 564-65 (Cal. 2010) (noting that the "kill zone theory of multiple attempted murder is necessarily defined by the nature and scope of the attack").  Thus, under California law, no further definition of "kill zone" is required.  Again, a determination of state law by a state appellate court is binding in a federal habeas action.  *Hicks v. Feiock*, 485 U.S. 624, 629 (1988).  Flenory-Davis cites to no Supreme Court authority, and this Court is not aware of any, that mandates that such a phrase be defined in a jury instruction.  Flenory-Davis is therefore not entitled to relief on this instructional error claim either.

Ground 3.     <u>Prosecutorial Misconduct</u>

Finally, Flenory-Davis claims that the prosecutor committed misconduct multiple times in summation.  To successfully raise a claim cognizable on habeas review based on a prosecutor's comments at trial, a petitioner must demonstrate that the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.*

*DeChristoforo*, 416 U.S. 637, 643 (1974)).  Under this standard, only egregious prosecutorial

misconduct can give rise to a constitutional claim.  *See Duckett v. Godinez*, 67 F.3d 734, 743

(9th Cir. 1995).  A prosecutor's comments in summation constitute grounds for reversal only

when the remarks caused actual prejudice.  *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004)

(applying harmless error test to claim of prosecutorial misconduct in summation).  Moreover, a

prosecutor must have "reasonable latitude" to fashion closing arguments.  *United States v.*

*Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).

A.      *Insertion of personal opinion*

Flenory-Davis argues that the prosecutor improperly inserted his own opinion on

summation.  The Court of Appeal considered and rejected this claim as follows:

> In closing argument, defense counsel referred to a Sherlock Holmes story about a dog that did not bark in the night, pointing out Alexander did not tell his girlfriend that defendant was the shooter.[FN3]  In rebuttal, the prosecutor replied as follows:
>> "Also, the idea that Nikko Alexander would tell his girlfriend that he saw [Flenory-Davis] do that shooting.  *It's my opinion* that that's not particularly something that you would expect to see these guys do, that these gang members would get to the point there they come home and say, Oh, I just saw Jay and he shot somebody up at the club.  You are not going to just come right out and tell on your buddy like that." (Emphasis added.)
>
> FN3.    Defense counsel referred to this passage of "Silver Blaze": "[Inspector Gregory]: 'Is there any other point to which would you would wish to draw my attention?' " [¶] "[Holmes]: 'To the curious incident of the dog in the night-time.' [¶] 'The dog did nothing in the night-time.' " [¶] " 'That was the curious incident,' remarked Sherlock Holmes." (2 Baring–Gould (2d ed. 1976) The Annotated Sherlock Holmes, p. 277.)
>
> [Flenory-Davis] claims the phrase "It's my opinion," emphasized in the above quote, was impermissible vouching.  Vouching occurs when a prosecutor expresses personal belief about evidence, such as whether or not a witness is telling the truth, because that suggests the prosecutor is basing the opinion on facts outside the record. (*See, e.g.*, *People v. Huggins* (2006) 38 Cal.4th 175, 206–207; *United States v. Kerr* (9th Cir.1992) 981 F.2d 1050, 1053.)  In the above passage, the prosecutor made an argument based on the trial evidence; the argument was that Alexander would not be inclined to tell

his girlfriend that [Flenory-Davis] was the shooter, given his and [Flenory-Davis'] gang affiliations and the circumstances surrounding the shooting. Although the prosecutor's opinion of the inference to be drawn from the evidence was not relevant, and the prosecutor should not have expressed his personal opinion in the manner that he did, he did not suggest any evidence outside the record and he did not vouch.

*Flenory-Davis*, 2014 WL 4088105, at *6.

Although the Court of Appeal refers to the challenged comment as "vouching," that term does not appear to be an accurate label. *See United States v. Wright*, 625 F.3d 583, 611 n.15 (9th Cir. 2010) (finding it incorrect to label certain comments by the prosecutor, in which he expressed his personal opinion about the evidence, as "vouching"), *superceded by statute on other grounds as stated in United States v. Lloyd*, 807 F.3d 1128 (9th Cir. 2015). As the Ninth Circuit has explained, "In the usual case of vouching, the prosecutor does not merely give his impression of the defendant's case, or highlight his own experience; rather, he explicitly assures the government witnesses' veracity." *Id.* (citations omitted). A prosecutor's reference to how he views the evidence, however, may constitute misconduct. *See United States v. Hermanek*, 289 F.3d 1076, 1100 (9th Cir. 2002) ("[P]rosecutors' arguments not only must be based on facts in evidence, but should be phrased in such a manner that it is clear to the jury that the prosecutor is summarizing evidence rather than inserting personal knowledge and opinion in to the case."); *See United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) ("[a] prosecutor has no business telling the jury his individual impressions of the evidence").

But as the Court of Appeal reasonably concluded, Flenory-Davis fails to show that the challenged comment was anything more than harmless. The jurors were instructed repeatedly to base their decisions on the evidence and that statements made by the attorneys are not evidence. Importantly, as the Court of Appeal noted, the prosecutor's comments did not suggest that he

was in possession of evidence outside the record.  Flenory-Davis has thus failed to show that the

comments so infected his trial with unfairness as to make the resulting conviction a denial of due

process.  *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004).

      B.    *Misstatement of facts*

      Flenory-Davis next contends that the prosecutor misstated the facts.  The Court of Appeal

considered and rejected this claim as follows:

> The prosecutor argued Skye B. identified [Flenory-Davis] as the shooter and
> picked him out of the lineup.  The defense argued Skye B. was mistaken, and wrongly
> identified others in the lineup as being present at the club.  In rebuttal, the prosecutor
> conceded Skye B. was not sure, but thought [Flenory-Davis] was the shooter, "And that
> ID comes from someone who has got nothing to gain, and she is right on point.  She is
> right on point.  That's somebody, not Nikko Alexander, that IDs him."
>
> On appeal, [Flenory-Davis] contends the prosecutor misstated the facts, because
> of Skye B.'s uncertainty about her identification.
>
> The jury was instructed that the arguments of counsel were not evidence, and to
> consider various factors in evaluating identification testimony, including the degree of
> certainty of the identification.  We presume the jury followed these instructions.  (*See
> People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  Further, it was within the jury's
> bailiwick to determine whether Skye B.'s identification of [Flenory-Davis] was
> sufficiently certain to be probative.  (*See People v. Gonzales*, *supra*, 68 Cal.2d at p. 472.)
> The prosecutor merely presented one plausible interpretation of Skye B.'s testimony.

*Flenory-Davis*, 2014 WL 4088105, at *6.

      A prosecutor may not misstate the evidence or refer to facts not in evidence.  *Darden*,

477 U.S. at 181-82; *Berger v. United States*, 295 U.S. 78, 84-85 (1935) (holding that prosecutor

"overstepped the bounds of . . . propriety and fairness" by "misstating the facts in his

cross-examination of witnesses; . . . putting into the mouths of such witnesses things which they

had not said; . . . suggesting by his questions that statements had been made to him personally

out of court, in respect of which no proof was offered; . . . [and] assuming prejudicial facts not in

evidence").  But again, a habeas petition alleging prosecutorial misconduct will be granted only

when the misconduct did "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Flenory-Davis fails to demonstrate fundamental unfairness here. The record fully supports the Court of Appeal's conclusion that "[t]he prosecutor merely presented one plausible interpretation of Skye B.'s testimony." *Flenory-Davis*, 2014 WL 4088105, at *6. In light of the record and the instructions as a whole, this Court cannot say that the appellate court's resolution of this claim was unreasonable or that the prosecutor's remarks deprived Flenory-Davis of a fair trial. This claim therefore also must fail.

C. *Improper appeal to sympathy*

Finally, Flenory-Davis argues that the prosecutor improperly appealed to the jury's sympathy by referring to the tragic death of Dupree. Because counsel did not object to the challenged statement at trial, the Court of Appeal found that Flenory-Davis had forfeited the claim on direct appeal. *Flenory-Davis*, 2014 WL 4088105, at *6. Because Flenory-Davis argued ineffective assistance of counsel with respect to the forfeiture, however, the Court of Appeal discussed the claim nonetheless, and ultimately concluded that counsel had a tactical reason for not objecting:

> Assuming for the sake of argument any improper appeal to sympathy was made, the defense tactic, expressed both in opening statement and in closing argument, was to concede that the crimes were heinous and unjustified, but to argue that Alexander, not [Flenory-Davis], committed them.

-17-

> Therefore, it was rational for the defense to refrain from objecting to argument emphasizing the nature of the crimes.  In fact, it may have bolstered the defense, by strengthening Alexander's motive to lie to and blame [Flenory-Davis].  Because the record shows a rational tactical reason for not objecting, the claim of misconduct must be rejected on this record.

*Flenory-Davis*, 2014 WL 4088105, at *7.

That conclusion is both reasonable and supported by the record.  The forfeited claim is therefore procedurally defaulted from federal habeas review under the contemporaneous-objection rule.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment).  The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial.  *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).  The state court's application of the procedural bar thus dooms Flenory-Davis' claim here.

## V. CONCLUSION AND ORDER

Flenory-Davis is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: July 7, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge